# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA ORGANIC FERTILIZERS, INC., <br><br> Plaintiff <br><br> v. <br><br> TRUE ORGANIC PRODUCTS, INC., <br><br> Defendant | CASE NO. 1:19-CV-0296 AWI EG <br><br> ORDER ON RULE 12(c) AND RULE 56(a) CROSS MOTIONS FOR JUDGMENT <br><br> (Doc. Nos. 11, 15) |

This is a business and false advertising dispute between Plaintiff California Organic Fertilizers, Inc. ("COFI") and True Organic Products, Inc. ("TOPI") involving claims of violations of the Lanham Act and the California Business and Professions Code. Currently before the Court are each parties' Rule 12(c) and Rule 56(a) cross motions for judgment regarding COFI's claims based TOPI's products that contain uncomposted chicken manure.[1] For the reasons that follow, TOPI's motion will be granted and COFI's motion will be denied.

## LEGAL FRAMEWORK

*Rule 12(c) – Judgment on the Pleadings*

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Fed. R. Civ. Pro. 12(c). Because the motions are functionally identical, the same standard of review applicable to a Rule 12(b)(6) motion applies to a Rule 12(c) motion. Dworkin v. Hustler

---

[1] The Court had granted the parties' request to delay issuing a ruling until the completion of voluntary mediation efforts. On September 5, 2019, the Court received word that the mediation efforts failed. Therefore, the cross motions are now ripe for decision.

1  Magazine, Inc., 867 F.2d 1188, 1192 (9th Cir. 1989).  The non-moving party's allegations are
2  accepted as true, and all reasonable inferences are drawn in the non-moving party's favor.  Hines
3  v. Youseff, 914 F.3d 1218, 1227 (9th Cir. 2019); Living Designs, Inc. v. E.I. DuPont de Nemours
4  & Co., 431 F.3d 353, 360 (9th Cir. 2005).  Any allegations made by the moving party that have
5  been denied or contradicted are assumed to be false.  See MacDonald v. Grace Church Seattle, 457
6  F.3d 1079, 1081 (9th Cir. 2006); Hal Roach Studios v. Richard Feiner & Co., Inc., 896 F.2d 1542,
7  1550 (9th Cir. 1989).  Although Rule 12(c) "does not expressly authorize 'partial' judgments,
8  neither does it bar them; it is common practice to apply Rule 12(c) to individual causes of action."
9  Mays v. Wal-Mart Stores, Inc., 354 F.Supp.3d 1136, 1141 (C.D. Cal. 2019); Cornejo v. Ocwen
10 Loan Serv'g LLC, 151 F.Supp.3d 1102, 1107 (E.D. Cal. 2015); Howerton v. Griffith Co., 2014
11 U.S. Dist. LEXIS 3336, *6 (E.D. Cal. Jan. 9, 2014); Carmen v. San Francisco Unified School
12 Dist., 982 F.Supp. 1396, 1401 (N.D. Cal. 1997).

*Rule 56(a) – Partial Summary Judgment*

Under Rule 56(a), a "party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  The same standard applies both to a motion for summary judgment and a motion for partial summary.  Valentich v. United States, 194 F.Supp.3d 1033, 1035 (E.D. Cal. 2016); see also California v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998).  Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Moldex-Metric, Inc. v. McKeon Prods., 891 F.3d 878, 881 (9th Cir. 2018).

# **FACTUAL BACKGROUND**[2]

From COFI's Complaint and the separate statements of fact submitted by the parties, COFI and TOPI produce a variety of organic fertilizers and fertilizer products and compete for business in the organic fertilizer market. TOPI controls, if not a majority, then a significant plurality of the market for organic fertilizers.

Organic products in the United States are federally regulated by the Organic Foods Production Act of 1990 ("OFPA") and the National Organic Program ("NOP"). The NOP is administered by the Agricultural Marketing Service ("AMS"), which is an arm of the United States Department of Agriculture ("USDA"). Any agricultural product that is sold or labeled as "100% organic," "organic," or "made with organic [ingredients or food groups]" must be produced in accordance with the regulations promulgated under the NOP. PSUF 3. Because an agricultural product may not be sold as "organic" if it is not produced in accordance with the NOP, organic farmers and USDA-accredited certifying agents depend on organic fertilizer companies to accurately label their products.

TOPI claims its products are suitable for use in organic farming and markets them for that purpose. PSUF 4. TOPI's website states that "[a]ll of its fertilizers are carefully formulated for use in organic farming and meet the requirements of the [NOP]." TOPI makes similar, if not identical statements, on its products' packaging and labeling.

Some of the chicken manure used by TOPI in its organic fertilizer products is uncomposted. PSUF 5. Uncomposted chicken manure has a greater nitrogen content than composted chicken manure, and thus, is more valuable for use as a fertilizer. Chicken manure is sold at a very low cost in comparison to other protein materials that are typically used as organic fertilizers. By using uncomposted chicken manure in some of its fertilizers, TOPI can sell the fertilizers at a lower cost point, in comparison to competing protein-based products (such as those offered by COFI).

Prior labels for TOPI's products indicate that they were derived from "composted" chicken

---

[2] "PSUF" refers to "Plaintiff's Statement of Undisputed Facts;" "DSUF" refers to "Defendant's Statement of Undisputed Facts."

litter. However, current labels and advertising no longer indicate that the chicken manure or chicken litter used in TOPI's products is "composted." Now, TOPI's website specifically identifies "heat treatment" as its method of pathogen control. TOPI's heat treatment process complies with NOP guidance documents, including Guidance Document 5006. See DSUF 5; Menes Dec. ¶¶ 4, 5.[3] TOPI's finished organic fertilizer products do not contain raw animal manure. DSUF 2.[4]

NOP regulates the use of uncomposted manure in organic farming. The AMS has issued regulations on the use of raw animal manure as a fertilizer through formal notice-and-comment rulemaking. However, none of TOPI's advertising materials comply with the applicable NOP/AMS restrictions on the use of raw uncomposted chicken manure. The labels for TOPI's fertilizer products containing chicken manure do not indicate: (1) the fertilizer should be used on crops not intended for human consumption; nor (2) crops treated with the fertilizer must be subjected to mandatory waiting periods between application of the manure and harvest. See PSUF 6.

## **PARTIES' CROSS-MOTIONS**

*COFI's Arguments*

COFI argues that 7 C.F.R. § 205.203 in part requires that "raw animal manure" must be composted unless it is used on crops that are not intended for human consumption or unless

---

[3] COFI objects that the declaration of Michael Menes that supports this DSUF lacks foundation, is an improper expert opinion, and contains legal conclusions. However, Menes is the Vice President of Food Safety & Technology at TOPI and is responsible for overseeing the manufacturing of TOPI's products. See Doc. No. 15-3 at ¶¶ 2, 3. Part of that job is ensuring compliance with NOP regulations and guidances. See id. Particularly highlighted is Menes's familiarity with NOP Guidance Document 5006, regarding heat processed manures. As the officer in charge of regulatory compliance, it is clear that Menes has the proper foundation to speak about TOPI's practices in complying with NOP regulations and guidances. COFI's evidentiary objections are overruled. Additionally, COFI objects that TOPI admitted in its answer that some of its products contain uncomposted chicken manure. However, that TOPI's products contain uncomposted chicken manure does not mean that TOPI is not in compliance with NOP Guidance Documents regarding heat processed manure. Therefore, TOPI's objections are overruled.

[4] COFI makes identical objections to DSUF 2 as it does to DSUF 5. Again, the Menes declaration demonstrates that he is familiar with TOPI's production, safety, and regulatory conformity practices to provide competent testimony. The dispute of DSUF appears to actually be over the use of the term "raw." As explained below, since the Court defines "raw" in that term's common and ordinary meaning, which is consistent with TOPI's position, the use of the term "raw" is not objectionable.

4

certain waiting periods are followed between the time of application of the manure and the time of harvesting the crop. The regulations further define "manure" as feces, urine, other excrement and bedding produced by livestock that has not been composted. Section 205.203 also sets the standards under which manure must be composted. The regulations mean that uncomposted animal manure is not banned from use in organic crop production, but the manure must be applied on crops not intended for human use or if waiting periods are met.

Section 205.203 was promulgated through the formal rulemaking process and was finalized in December 2000, following periods for notice and comment. The public submitted thousands of comments on § 205.203, including comments about the definition of "manure." AMS in part solicited comments regarding the use of raw manure in organic farming because while there are benefits to using raw manure, application of raw manure can be hazardous and threaten pathogenic contamination of food. Because § 205.203 followed applicable rulemaking procedures, it has the force and effect of law. Regulations that have the force and effect of law can only be changed, amended, or repealed through the same formal rulemaking procedures. TOPI admits that it does not use composted manure in its products and does not make any mention of § 205.203 in its labeling. Despite the restrictions of § 205.203, TOPI's products state they are suitable for use in organic farming without limitation. Because no limitations are mentioned, TOPI's labeling is literally false by necessary implication under the Lanham Act.

COFI argues that reliance on NOP guidance document 5006 ("Guidance 5006) is unavailing. Guidance 5006 states that § 205.203 does not address heat processed animal manure products. Guidance 5006 then states processed manure products can be used on crops intended for human consumption if certain heating procedures (or equivalent heating and drying processes) are followed. Guidance 5006 lacks the force and effect of law, it is nothing more than a statement about what AMS thinks about "heat processed" manure and cannot supersede any requirement of state or federal law. Guidance 5006 can be amended at any time, does not have any legal effect, and cannot amend § 205.203 or change any of its requirements. Moreover, even if NOP sought to enact Guidance 5006 as a legislative rule, the act would be *ultra vires* because Guidance 5006 falls outside of the relevant authorizing statute, 7 U.S.C. § 6513. That section contemplates organic

5

farming operations will be developed through a plan that is certified by an appropriate certifier. The plan may provide for the application of raw manure, but with respect to crops for human consumption, the crop must be harvested at a reasonable time after application of the raw manure as determined by the "certifying agent," but in no event less than 60 days.

In reply, COFI argues in part that no regulation having the force and effect of law suggests that "heat processed manure" is permissible for use in organic farming without restriction. The language, structure and regulatory history of § 205.203 make clear that the term "raw manure" refers to uncomposted manure. The definition of "manure" is animal excrement "that has not been composted." Thus, "raw manure" refers to manure that is uncomposted. The structure of § 205.203 shows that the only characteristics contemplated are whether the materials are composted or uncomposted and whether they are comprised of plant and animal materials. "Heat processed manure" is not mentioned. Further, as part of the March 2000 Rulemaking, the USDA noted that "raw animal manure" must be composted or comport with waiting periods or used on crops not grown for human consumption. A number of comments were received regarding the use of raw manure. The USDA also noted that its original proposal permitted the use of any uncomposted plant or animal wastes. Also, the initial definition of "compost" juxtaposed "compost" and "raw materials," noting that compost must use methods to raise the temperature of the raw materials to kill pathogens but stabilize nutrients. Nowhere in the proposed Rulemaking was the topic of "heat processed" manures discussed. The Final Rulemaking in December 2000 unequivocally confirms that "raw" animal manure refers to "uncomposted" animal manure. The USDA explained its decision to not require composting in accordance with practices set by the Natural Resource Conservation Service. The USDA stated that the OFPA contains significant restrictions on "raw manure," that the restrictions pertain to raw manure, but do not apply once fresh animal materials are transformed into a composted material. An organic producer using composted material must follow nutrient and soil cycling standards, but need not follow the restrictions that apply to raw manure. The sole distinction the USDA sought to draw in the Final Rulemaking is between raw/uncomposted manure and composted manure. Because "heat processed manure" is not part of § 205.203 or its history, TOPI's marketing does not conform to § 205.203.

*TOPI's Arguments*

TOPI argues that COFI's motion is based on the false notion that under § 205.203, any uncomposted chicken manure must be considered raw manure. This interpretation of § 205.203 is inconsistent with the plan language of § 205.203 and longstanding NOP guidance statements.

The terms "raw" and "raw manure" are not defined § 205.203. The common dictionary definition of "raw" means being in a natural condition, not refined or processed. Other parts of NOP regulations recognize a distinction between "raw" and "processed." For example, the definition of "agricultural product" is "[a]ny agricultural commodity or product, whether raw or processed . . . that is marketed in the United States for human or livestock consumption." Because the chicken manure in the products at issue is heat treated/processed, it is not "raw" for purposes of § 205.203. Thus, additional statements on product labels regarding § 205.203(c)(1)'s restrictions are unnecessary.

Guidance 5006 references § 205.203 and provides that processed manure may be used as a soil supplement without regard to any interval between application and harvest. The treatment process, involving heat processing, is identified. Guidance 5006 is also consistent with Guidance 5034, and specifically a table entry at Guidance 5034-1. The table identifies materials that are not prohibited under the USDA organic regulation. Included on Guidance 5034-1 is manure, including raw manure, composted manure, and processed manure/heat processed manure. TOPI argues that its heat processing conforms with the requirements of Guidance 5006. Although Guidance 5006 does not have the force of law, that does not mean that it should be ignored. Guidances are intended to instruct certifiers and producers and to ensure a uniform roadmap for enforcing NOP regulations. The NOP handbook explains that the guidances set forth interpretations of NOP regulations and explain how the regulations will apply to certain regulated activities. NOP's interpretation of § 205.203 as set out in the guidances is entitled to deference.

In reply, TOPI reiterates that the plain language of § 205.203 does not apply to its products because its products do not contain raw chicken manure. Dictionary definitions of "raw" confirm that its heat processed manures are not "raw." COFI's arguments essentially read the term "raw" out of § 205.203. Moreover, since all manure is uncomposted by definition, the term "raw

manure" must mean something other than just uncomposted manure. Additionally, the regulatory history does not show that the counterpoint to raw is composted manure. The regulatory history shows that the USDA was struggling with standards for application of raw manure, the focus was not on what constitutes raw manure. If anything, the regulatory history shows that the USDA recognized and emphasized the importance of standards set by the National Organic Standards Board, which is the same board that recommended the adoption of Guidance 5006.

*Relevant Regulations*

In relevant part, 7 C.F.R. § 205.203[5] reads:

(c) The producer must manage plant and animal materials to maintain or improve soil organic matter content in a manner that does not contribute to contamination of crops, soil, or water by plant nutrients, pathogenic organisms, heavy metals, or residues of prohibited substances. Animal and plant materials include:

(1) Raw animal manure, which must be composted unless it is:
(i) Applied to land used for a crop not intended for human consumption;

(ii) Incorporated into the soil not less than 120 days prior to the harvest of a product whose edible portion has direct contact with the soil surface or soil particles; or

(iii) Incorporated into the soil not less than 90 days prior to the harvest of a product whose edible portion does not have direct contact with the soil surface or soil particles;

(2) Composted plant and animal materials produced though a process that:

(i) Established an initial Cratio of between 25:1 and 40:1; and

(ii) Maintained a temperature of between 131 [degrees] F and 170 [degrees] F for 3 days using an in-vessel or static aerated pile system; or

(iii) Maintained a temperature of between 131 [degrees] F and 170 [degrees] F for 15 days using a windrow composting system, during which period, the materials must be turned a minimum of five times.

(3) Uncomposted plant materials.

7 C.F.R. § 205.2 defines "manure" as "[f]eces, urine, other excrement, and bedding produced by livestock that has not ben composted."

---
[5] 7 C.F.R. § 205.203 is regulation issued by the ASM pursuant to the NOP. The statutory authority for this regulation is 7 U.S.C. § 6501 et seq., the Organic Foods Production Act of 1990.

8

7 C.F.R. § 205.2 defines "compost" in relevant part as "[t]he product of a managed process through which microorganisms break down plant and animal materials into more available forms suitable for application to the soil."[6]

*Legal Standard*

"Regulations are interpreted according to the same rules as statutes, applying traditional rules of construction." Amazon.com, Inc. v. Comm'r, 934 F.3d 976, 984 (9th Cir. 2019) Minnick v. Comm'r, 796 F.3d 1156, 1159 (9th Cir. 2015). An interpretation of a regulation may include an examination of "the text, structure, history, and purpose of a regulation." Kisor v. Wilkie, 139 S. Ct. 2400, 2415 (2019); Amazon.com, 934 F.3d at 984. "A regulation should be construed to give effect to the natural and plain meaning of its words." Secretary of Labor v. Seward Ship's Drydock, Inc., 937 F.3d 1301, 1308 (9th Cir. 2019); Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n, 366 F.3d 692, 698 (9th Cir. 2004). "As a general interpretive principle, 'the plain meaning of a regulation governs.'" Safe Air for Everyone v. EPA, 488 F.3d 1088, 1097 (9th Cir. 2007) (quoting Wards Cove Packing Corp. v. National Marine Fisheries Serv., 307 F.3d 1214, 1219 (9th Cir. 2002)); see also Bergelectric Corp. v. Secretary of Labor, 925 F.3d 1167, 1171 (9th Cir. 2019). "Other interpretive materials, such as the agency's own interpretation of the regulation, should not be considered when the regulation has a plain meaning." Safe Air, 488 F.3d at 1097. "If the regulatory language is clear and unambiguous, the inquiry ends with the plain meaning." Goodman v. Shulkin, 870 F.3d 1383, 1386 (Fed. Cir. 2017); Roberto v. Department of Navy, 440 F.3d 1341, 1350 (Fed. Cir. 2006); see Safe Air, 488 F.3d at 1097 (citing and parenthetically quoting *Roberto*). However, the plain language of a regulation will not control if clearly expressed administrative intent is to the contrary or if such plain meaning would lead to absurd results. Pacific Bell Tel. Co. v. California PUC, 621 F.3d 836, 848 (9th Cir. 2010); Safe Air, 488 F.3d at 1097. "The regulatory intent that overcomes plain language must be referenced in the published notices that accompanied the rulemaking process." Pacific Bel, 621 F.3d at 848; Safe Air, 488 F.3d at 1097. A rule leads to "absurd results" only if it is "patently inconceivable" that an agency intended the result. Pacific Bell, 621 F.3d at 848; Safe

---
[6] The definition also contains the requirements for "composted plant and animal materials" found in § 205.203(c)(2).

9

Air, 488 F.3d at 1098.  When construing a regulation, courts look to the whole law/regulation, and to its object and policy, not simply to a single sentence or member of a sentence.  United States ex rel. Lee v. Corinthian Colleges, 655 F.3d 984, 994 (9th Cir. 2011); see also Amazon.com, 934 F.3d at 986.  Further, unless a term is defined by a relevant regulation, "words will be interpreted as taking their ordinary, contemporary, common meaning."  Sandifer v. U.S. Steel Corp., 571 U.S. 220, 227 (2014); Yith v. Nielsen, 881 F.3d 1155, 1165 (9th Cir. 2018); United States v. Bibbins, 637 F.3d 1087, 1091 (9th Cir. 2011).  In determining the plain meaning of a word that is undefined by a regulation, courts may consult dictionary definitions.  Sandifer, 571 U.S. at 227-28; Yith, 881 F.3d at 1165; Bibbins, 637 F.3d at 1091.

*Discussion*

1. Interpretation of § 205.203(c)(1)

7 C.F.R. § 205.203 is entitled "Soil fertility and crop nutrient management practice standard."  The regulation in general requires organic producers to "select and implement tillage and cultivation practices that maintain or improve the physical, chemical, and biological condition of soil and minimize soil erosion."  7 C.F.R. § 205.203(a).  Producers are to manage crop nutrients and soil fertility through rotations, cover crops and plant and animal materials.  See id. at § 205.203(b).  7 C.F.R. § 205.203(c) deals with plant and animal materials that are to be used in soil management.  That section requires producers to manage plant and animal materials in such a way as to not contaminate soil, water, and crops with pathogenic organisms, heavy metals, or residues of prohibited substances.  See id. at § 205.203(c).  In other words, producers must manage their plant and animal inputs in such a way as to benefit the soil and not cause contamination.  In furtherance of this goal, the regulation addresses "raw animal manure."  7 C.F.R. § 205.203(c)(1).  As quoted above, § 205.203(c)(1) permits application of raw animal manure if one of two waiting periods between application and harvest applies or if the crop is not intended for human consumption.  Therefore, § 205.203(c)(1) is a considered opinion that the risks of contamination from raw animal manure is insubstantial if one of the waiting periods is met or if the crop is not intended for human consumption.

"Manure" is a defined term for purposes of § 205.203.  Utilizing the regulatory definition

of "manure," the relevant regulation would read: "Raw animal feces, urine, other excrement, and bedding produced by livestock that has not been composted, which must be composted unless [it meets the waiting periods or crop limitation]."

The Court makes two observations following the insertion of the definition of "manure." First, if the feces, urine, other excrement and bedding has been composted, then it is not "manure" for purposes of § 205.203(c)(1). Second, the word "raw" is not part of the definition of "manure." Thus, the word "raw" remains in § 205.203(c)(1) even when the definition of "manure" is inserted into § 205.203(c)(1). By the express terms of the regulation, if the "manure" is not "raw," then § 205.203(c)(1)'s restrictions do not apply. The question becomes what the meaning of "raw" is.

Unlike the term "manure," the term "raw" is not defined. Therefore, the Court will consult dictionaries in order to determine the ordinary, contemporary, common meaning" of "raw." See Sandifer, 571 U.S. at 227-28; Yith, 881 F.3d at 1165; Bibbins, 637 F.3d at 1091. Merriam Webster's On-Line Dictionary defines "raw" in relevant part as either (1) not cooked or (2) being in or nearly in the natural state: not processed or purified."[7] This is the identical definition that appears in the 1979 edition of Webster's New Collegiate Dictionary. The Cambridge On-Line Dictionary defines "raw" in relevant part as either (1) not cooked or (2) not processed or treated; in its natural condition."[8] The Oxford English On-Line Dictionary defines "raw" in relevant part as: (1) uncooked; unprocessed, unrefined or (2) in a natural state; not yet processed or worked.[9] TOPI cites similar definitions from dictionaries published in 2000, 1994, 1991, and 1956. See Doc. No. 15-2 at 9:23-10:1. COFI does not challenge these definitions or present other dictionary definitions of "raw." Accordingly, the court will view the term "raw" as having the same meaning today as it did in 1956: uncooked, unprocessed, or untreated, in a natural state.

Utilizing both this understanding of "raw" and the regulatory definition of "manure," § 205.203(c)(1) would read: "Uncooked, unprocessed, or untreated animal feces, urine, other excrement, and bedding produced by livestock that has not been composted, which must be

---

[7] See https://www.merriam-webster.com/dictionary/raw

[8] See https://dictionary.cambridge.org/us/dictionary/english/raw

[9] See https://www.oed.com/view/Entry/158694?rskey=g63xfW&result=2#eid

11

composted unless [it meets one of the exceptions]." With the above understanding of "raw" and the regulatory definition of "manure," the plain meaning of § 205.203(c)(1) is that its restrictions do not apply if the "manure" has been composted (in which case the animal material no longer meets the definition of "manure") or if the "manure" has been cooked, processed, or treated (in which case it is no longer "raw").

This reading of § 205.203(c)(1) is in harmony with the regulatory context. As discussed above, § 205.203(c) is meant to promote proper soil management and to reduce the risk of pollution, including the risk of pollution through pathogenic organisms. It is beyond debate that manure contains pathogenic organisms. Thus, there is a danger of pathogenic pollution from the use of raw manure. It is also beyond debate that in general, manure that has undergone some form of processing or treatment will have fewer pathogens than raw manure.[10] With reduced quantities of pathogenic organisms comes a reduced risk of significant pathogenic soil contamination. In other words, processing or treating the manure is consistent with the goal of proper soil management and reducing the threat posed by pathogenic organisms.

A regulation's plain meaning will not control if it would lead to absurd results. See Pacific Bell, 621 F.3d at 848; Safe Air, 488 F.3d at 1098. However, COFI does not argue that "absurd results" will occur from this reading of § 205.203(c)(1), and the Court detects none. It is not "patently inconceivable," see id., that the USDA would view raw manure, composted manure, and processed/treated manure differently when considering soil management and the possibility of soil contamination from pathogenic organisms. Each type of manure would necessarily carry its own set of risks and benefits.

COFI does contend that the rulemaking process that § 205.203 underwent clearly shows that "raw manure" means "uncomposted manure." As noted above, the "regulatory intent that overcomes plain language must be referenced in the published notices that accompanied the rulemaking process." Pacific Bel, 621 F.3d at 848; Safe Air, 488 F.3d at 1097. The Court has reviewed the relevant portions of the rulemaking process that has been cited and relied upon by

---

[10] The type and degree of cooking or processing will determine the efficacy of risk reduction. For example, cooking chicken to an internal temperature of 165° F is considered sufficient to kill harmful pathogenic organisms. See https://www.foodsafety.gov/food-safety-charts/safe-minimum-cooking-temperature.

12

COFI. The Court cannot conclude that the rulemaking process reflects the clearly expressed administrative intent for "raw manure" to mean "uncomposted manure."

With respect to the March 2000 phase of the rulemaking process, Page 13532 of the Federal Register in relevant part explained that under the proposed rule, "[r]aw animal manure must either be composted, applied to land used for a crop not intended for human consumption, or [meet one of two waiting periods between application and harvest]." 65 Fed. Reg. 13512, 13532 (Mar. 13, 2000). Pages 13540 to 13541 describe the public comments and response to "appropriate guidelines to ensure that use of raw animal manure would not cause contamination of food products by pathogens that cause foodborne illness." Id. at 13540. The rulemaking process noted that the "OFPA restricts the use of raw animal manure by requiring that a reasonable period of time elapse between its application to a crop intended for human consumption and the harvest of the crop." Id. It was noted that many commenters felt that the minimum 60 day waiting period mandated by the OFPA was insufficient. See id. The NOP responded that regulations for the application of "raw manure" was challenging for several reasons, and that "[a]pplications of raw manure are hazardous, threatening pathogenic contamination off food products, notwithstanding the use of composted manure, which can carry similar hazards." Id. at 13540-41. The NOP responded to the comments by proposing that "raw animal manure must be composted, unless [it is applied to a crop not intended for human consumption or meets one of two waiting periods between application and harvest.]" Id. at 13541. The USDA then requested additional comments regarding intervals between application and harvest and greater scientific understanding regarding the spread of pathogens in "raw manure." Id.

The rulemaking history of March 2000 confirms that the USDA's focus was on "raw manure." The USDA was concerned about pathogens in "raw manure" and attempting to implement standards for its safe use. However, addressing how "raw manure" can be used, either composted or with waiting periods, does not show that "raw manure" is synonymous with "uncomposted manure." A cooked, treated, or processed manure would not necessarily pose the same risks of pathogen contamination as "raw manure." That "processed manure" or "treated manure" is not mentioned in the rulemaking history is hardly surprising because such forms of

13

manure are not "raw," as that term is plainly and commonly understood. All the March 2000 rulemaking shows is that the USDA was attempting to find a suitable and enforceable regulation regarding "raw manure." There is nothing in the cited March 2000 rulemaking process that clearly shows that the USDA equated "raw manure" with "uncomposted manure," or that the USDA intended a meaning for "raw manure" that was contrary to the term's plain meaning.

With respect to the final phase of the rulemaking process in December 2000, the USDA noted comments complaining that there was no definition of the term "manure." 65 Fed. Reg. 80548, 80550 (Dec. 21, 2000). The comments noted that the different provisions contained in the practice standard for "manure" and "compost" would be difficult to enforce without clear definitions to differentiate between the two materials. See id. The USDA agreed with those comments and adopted the definition of "manure" found at 7 C.F.R. § 205.2 ("feces, urine, other excrement, and bedding produced by livestock that has not been composted"). Id. Additionally, in a section heavily relied upon by COFI, the USDA discussed comments regarding a proposed rule that composting facilities meet the practice standards of the Natural Resources Conservation Service ("NRCS"). See id. 80564. In relevant part, the USDA responded:

> We agree with commenters who stated that, given the diversity of composting systems covered by a national organic standard, requiring full compliance with the NRCS practice standard would be overly prescriptive. We maintain, however, that implementation of the OFPA requires a rigorous, quantitative standard for the production of compost. The OFPA contains significant restrictions on applying raw manure that are reflected in the soil fertility and crop nutrient management practice standard. These restrictions pertain to raw manure and do not apply once fresh animal materials are transformed into a composted material. An organic producer using a composted material containing manure must comply with the nutrient cycling and soil and water conservation provisions in his or her organic system plan but is not constrained by the restrictions that apply to raw manure. Therefore, producers intending to apply soil amendments will require clear and verifiable criteria to differentiate raw manure from composted material. We developed the requirements in the final rule for producing an allowed composted material by integrating standards used by the Environmental Protection Agency (EPA) and USDA's Natural Resources Conservation Service (NRCS). The requirements for the carbon-to-nitrogen (C:N) ratio for composting materials are the same as that found in the NRCS practice standard for a composting facility. The time and temperature requirements for in-vessel, static aerated pile, and windrow composting systems are consistent with that EPA regulates under 40 CFR Part 503 for the production of Class A sewage sludge. Additionally, AMS reviewed these compost production requirements with USDA's Agricultural Research Service (ARS).

Id.

The cited passages from the December 2000 rulemaking do not clearly show that "raw manure" is the same as "uncomposted manure." To be sure, there is no discussion of non-raw manure or manure that has undergone some form of heat processing or treatment. But given the context of the USDA's comment, that is unsurprising. The above passage is primarily addressing composting, composting systems, and composting standards. A significant concern was clearly the question of how to utilize raw manure in a composting process so as to minimize the risk of pathogenic contamination. Within the context of composting, the USDA explained that it needed verifiable criteria to determine when "raw manure" had been through a sufficient composting process such that the final "product" could then be considered safe composted material. In other words, the passage explains when raw manure may be considered transformed into compost, it does not say that raw manure is the same as uncomposted manure in all cases and in all senses.

There is some support for COFI's position that is found in the "Background" section of Guidance 5006. In relevant part, Guidance 5006 explained that, "[i]n the past, the NOP had determined that processed manures, since they had not been composted according to NOP regulations, would fall in the category of uncomposted manure products for the purpose of determining any restrictions which should be placed on their use in organic production." Doc. No. 12-2 at p.100. However, Guidance 5006 does not point to any regulation, guidance, or other document in support of that interpretation, such an interpretation renders the word "raw" superfluous, and it is contrary to the plain meaning of "raw." Further, that interpretation was superseded in 2011 with the adoption of Guidance 5006. Guidance 5006 permits the use of heat processed manures, without the restrictions imposed by § 205.203(c)(1), if all portions of the manure reach certain temperatures for certain periods of time and reach a maximum moisture level of 12%.[11] See id. at p. 101.

---

[11] The "Policy" section of Guidance 5006 reads in relevant part: "Processed manure may be used as a supplement to a soil building program without a specific interval between application and harvest. . . . Processed manure products must be treated so that all portions of the product, without causing combustion, reach a maximum temperature of either 150° F (66° C) for at least one hour or 165° F (74° C), and are dried to a maximum moisture level of 12%; or an equivalent hearing and drying process could be used. In determining the acceptability of an equivalent process, processed manure products should not contain more than 1x10³ (1,000) MPN (Most Probable Number) fecal coliform per gram of processed manure sampled and not contain more than 3 MPN Salmonella per 4 gram sample of processed manure." Doc. No. 12-2 at 101.

15

Additionally, the "Background" section of Guidance 5006 indicates that a 2006 recommendation from the National Organic Standards Board ("NOSB")[12] serves as the foundation for Guidance 5006. See id. at pp.100-01. Documents dated October 2006 and November 2006 from the NOSB indicate that the purpose of the recommendation was to implement a guidance statement about the "Use of Compost, Vermicompost, Processed Manure and Compost Tea." Id. at p.104. The "rationale supporting [the] recommendation" was in part to "provide guidance for certain types of compost and manure inputs commonly used in organic farming that *were not directly addressed* in [§ 205.203]." Id. (emphasis added). The recommendation permitted the use of "processed manure" without the restrictions of § 205.203. See id. at p.106. "Processed manure" was defined as "manures that have been treated by heating and drying to reduce pathogenic organisms." Id. at p.105. The 2006 recommendation necessarily indicates that "processed manure" is not directly addressed by § 205.203. See id. at pp.104-05. The recommendation also relied in part on a Compost Task Force Report from April 2002. See id. at p.105. The Task Force Report noted specific weaknesses of § 205.203, including that "[m]anures that have been heat treated to eliminate pathogenic organisms without composting *are not addressed*." Id. at p.108 (emphasis added). The history of Guidance 5006 persuasively indicates that heat processed manure or non-raw manure is not addressed by § 205.203, and is consistent with the Court's "plain meaning" interpretation of "raw manure" under § 205.203.

In sum, for purposes of this motion, the Court finds that the plain meaning of § 205.203(c)(1) is that its restrictions apply to "raw manure," but do not apply if the "manure" has been composted (in which case the animal material no longer meets the definition of "manure") or if the "manure" has been cooked, processed, or treated (in which case it is no longer "raw").

2.  Application

Because heat processed manure is not the same as raw manure, simply because TOPI

---

[12] According to the AMS website, the NOSB is a 15-member Federal Advisory Board that was established by the OFPA and is governed by the Federal Advisory Committee Act. See https://www.ams.usda.gov/rules-regulations/organic/nosb. The NOSB considers and makes recommendations on a wide range of issues involving the production, handling, and processing of organic products. Id. If an NOSB proposal receives at least a two-thirds majority, the proposal becomes a recommendation to the USDA and is provided to the Secretary of Agriculture through the AMS NOP. Id.

admits that some of its products contain uncomposted chicken manure does not necessarily mean that TOPI is improperly marketing its products without § 205.203(c)(1) restrictions. Therefore, TOPI's admission is not a basis for a Rule 12(c) judgment.

There is no dispute that TOPI uses chicken manure that has been heat processed, and that the heat process complies with Guidance 5006. <u>See</u> DSUF's 2, 4, 5; Menes Dec. ¶¶ 3, 4, 5. Because TOPI's chicken manure input has been heat processed, it is not "raw" for purposes of § 205.203(c)(1). Therefore, the labels for TOPI's products that contain chicken manure do not need to include the crop or waiting time restrictions of § 205.203(c)(1). To the extent that any of COFI's claims depend on TOPI including the restrictions of § 205.203(c)(1) on the labels of its chicken manure containing product, summary judgment/partial summary judgment in favor of TOPI is appropriate.

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's Rule 12(c)/Rule 56(a) motion (Doc. No. 11) is DENIED;
2. Defendant's Rule 12(c)/Rule 56(a) motion (Doc. No. 15) is GRANTED;
3. Judgment/partial judgment in favor of Defendant on any of Plaintiff's claims that depend on Defendant including the restrictions of 7 C.F.R. § 205.203(c)(1) on the labels of its chicken manure containing products is GRANTED; and
4. This matter is referred to the Magistrate Judge for the purpose of entering a scheduling order.

IT IS SO ORDERED.

Dated:  October 22, 2019

_____
SENIOR DISTRICT JUDGE